## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA

CHARLES E. STUBY and                    Civil Division
LUKAS J. BERKEY,

          Plaintiffs,                 No.12-47

     v.

BEDFORD COUNTY and
CHARWIN REICHELDERFER,
in his individual and official capacities,

          Defendants.              JURY TRIAL DEMANDED

## PLAINTIFFS' PRETRIAL STATEMENT

Plaintiffs, Charles Stuby and Luke Berkey, by undersigned counsel, file this Pre-Trial

Statement as follows:

## A. WITNESSES   -   LIABILITY

**A.**    **Plaintiff Will Call**

1.    Charles Stuby
    7016 Hyndman Road
    Buffalo Mills, PA 15534

2.    Lukas Berkey
    117 Election House Road
    Buffalo Mills, PA 15534

3.    Charwin Reichelderfer
    c/o Bedford County
    200 South Juliana Street
    Bedford, PA 15522

**B.**    **Plaintiff May Call**

    Troy Nelson
    c/o Bedford County
    200 South Juliana Street
    Bedford, PA 15522

Diane Nelson
c/o Bedford County
200 South Juliana Street
Bedford, PA 15522

Cynthia Fouts
1074 Centerville Road
Bedford, PA 15522

Casey Shoemaker
c/o Thomas Chevrolet Subaru
4003 Business 220
Bedford, PA 15522

Lesley Childers-Potts
c/o Bedford County
200 South Juliana Street
Bedford, PA 15522

Robert Fleetwood
c/o Bedford County
200 South Juliana Street
Bedford, PA 15522

Ashley Faupel
c/o Bedford County
200 South Juliana Street
Bedford, PA 15522

Mark Zimmerman
c/o Thomas Chevrolet Subaru
4003 Business 220
Bedford, PA 15522

Mandi Allison
c/o Bedford County
200 South Juliana Street
Bedford, PA 15522

Hollie Snyder
c/o Bedford County
200 South Juliana Street
Bedford, PA 15522

Barry A. Crawford
c/o Bedford County
200 South Juliana Street
Bedford, PA 15522

Cindy Emerick
202 Main Street
Osterburg, PA 16667

## II. WITNESSES - DAMAGE

**A.**   **Plaintiff Will Call**

1.   Charles Stuby
     7016 Hyndman Road
     Buffalo Mills, PA 15534

2.   Lukas Berkey
     117 Election House Road
     Buffalo Mills, Pa 15534

**B.**   **Plaintiff May Call**

Christal Berkey
117 Election House Road
Buffalo Mills, PA 15534

James Berkey
1030 County Ridge Road
Bedford, PA 15522

Mitzi Berkey
1030 County Ridge Road
Bedford, PA 15522

Doug Miller
620 Perrin Road
Everett, PA 15537

Beth Miller
620 Perrin Road
Everett, PA 15537

Debra Stuby
7016 Hyndman Road
Buffalo Mills, PA 15534

Sharon Crawford
7497 Hyndman Road
Buffalo Mills, PA 15534

Dr. Eugene Nalin
909 B. Seton Drive
Cumberland, MD 21502

Dr. Henry Schoenthal
4186 Cortland Drive
New Paris, PA 15554

## III. EXHIBITS

**A.      Plaintiff Expects to Offer**

1.      7/11/12 Letter from Dr. Nallin re: C. Stuby (Stuby 12)

2.      Job Search Efforts re: C. Stuby (Stuby 112)

3.      Photo of Sheriff Hat (Stuby 113)

4.      Photo of Sheriff T-Shirt (Stuby 114)

5.      Sheriff T-Shirt

6.      Sheriff Hat

7.      7/11/12 Letter from Dr. Shoenthal re: L. Berkey (Berkey 1-2)

8.      Job Search Efforts re: L. Berkey (Berkey 318-321)

9.      9/9/11 Photos taken with Berkey's Phone and emailed to newspaper (Berkey 326-331)

10.     County of Bedford Standard Operating Procedures Manual Amended 1/2/08 and 12/15/09 (bates 41-103)

11.     County of Bedford Employee Handbook (bates 104-139)

12.     11/10/11 Memo C. Reichelderfer to Bedford County Commissioners re: termination of Charles Stuby (bates 147-148)

13.     Misc. Handwritten Notes (bates 165)

14.     11/5/11 Bedford Gazette Article " Odds over D.A.R.E." (bates 190)

15.     Article "Sheriff candidates discuss the job, improvements" (bates 191-193)

16.     Photographs of Stuby wearing "Sheriff" T-Shirt (bates 208-209)

17.     11/10/11 Memo C. Reichelderfer to Bedford County Commissioners re: termination of L. Berkey (bates 219)

18.     9/10&11/11 "Rising creeks flood county roads....." (bates 238)

19.     11/17/11 Email B. Crawford to R. Massey re: Stuby unemployment claim (bates 447-449)

20.     11/21/11 Email B. Crawford to R. Massey re: Berkey unemployment claim (bates 575 -577)

21.     Responsive Campaign Documents (bates 676-680)

22.     Job Description for Deputy Sheriff (bates 682)

23.     Posting by Sheriff on PAFOA Internet Site (bates 683-717)

24.     Bedford Gazette Article January 2008 (bates 718a-719a)

25.     9/20/11-10/5/11 Emails between E. Whisker and C. Reichelderfer re: Erick Whisker (bates 721-722)

26.     Sheriff's Violations of Duty List (bates 1092-1093)

27.     Metadata for bates 147-148, 291, 439-440 and 537 (bates 1118-1132)

**B.      Plaintiff May Offer**

28.     1/1/11-12/31/13 Agreement between County of Bedford and Bedford County Court Related Employees Associates (bates 3-40)

29.     11/1/07 Re-Elect Gordon Diehl Bedford County Sheriff (bates 194)

30.     Excerpt from 2007 Report of the Bedford County Auditors of Bedford County, Pennsylvania (bates 197-200)

31.     Excerpt from 2008 Report of the Bedford County Auditors of Bedford County. Pennsylvania (bates 201-202)

32.     Excerpt from 2009 Report of the Bedford County Auditors of Bedford County, Pennsylvania (bates 203-204)

33.     Excerpt from 2010 Report of the Bedford County Auditors of Bedford County, Pennsylvania (bates 205-206)

34.     2/14/11 Bedford Gazette Article "Stuby in running for Democratic sheriff's nomination" (bates 207)

35.     Budget Amount Allocated to Bedford County Sheriff's Office for each year Gordon Diehl served as Bedford County Sheriff (bates 1094-1117)

36.     12/10/07 Letters from T. Nelson re: D.A.R.E. Classes (bates 1133-1136)

37.     Memorandum on Animal Cruelty Complaint Policy (bates 1175-1177)

38.     Plaintiffs' First Set of Interrogatories and Request for Production of Documents Directed to Defendant, Bedford County including any and all responses

39.     Plaintiffs' First Set of Interrogatories and Request for Production of Documents Directed to Defendant, Charwin Reichelderfer including any and all responses

40.     Plaintiffs' Second Set of Interrogatories and Request for Production of Documents Directed to Defendants

41.     Deposition transcripts including exhibits of:
        Lesley Childers-Potts taken September 28, 2012
        Robert Fleetwood taken September 28, 2012
        Cynthia Fouts taken September 11, 2012
        Ashley Faupel taken September 28, 2012
        Diane Nelson taken September 28, 2012
        Troy Nelson taken September 28, 2012
        Charwin Reichelderfer taken September 10, 2012
        Casey Shoemaker taken October 4, 2012
        Mark Zimmerman taken September 28, 2012

## IV. NARRATIVE STATEMENT

### I.   Introduction

Defendants, Bedford County and Sheriff Charwin Reichelderfer, fired Deputy Sheriff Charles Stuby two days after Reichelderfer, a Republican, defeated Democratic candidate Stuby in an election for Sheriff. Defendants also fired Deputy Sheriff Lukas Berkey, a Democrat and supporter of Stuby, two days after Reichelderfer was reelected. The day Reichelderfer fired Stuby and Berkey, he prepared letters to the County Commissioners in which he referenced Stuby's bid

for Sheriff and Berkey's support of Stuby. When asked in discovery why Defendants fired Stuby and Berkey, Defendants claimed the reasons set forth in the termination letters sent to the Commissioners as the sole reasons for their discharge. Later, Defendants added a laundry list of additional reasons for firing Stuby and Berkey. However, Reichelderfer did not mention any of those reasons to Stuby and Berkey at any time before this litigation.

## II. Background

Stuby worked for Defendant as a Deputy Sheriff from 2000 to November 10, 2011. Berkey worked for Defendant as a Deputy Sheriff from February 3, 2003 to November 10, 2011. As Deputies, Stuby and Berkey's job responsibilities included prisoner transport; transportation for citizens serving jury duty; courtroom security; service of civil process; law enforcement; Vehicle Code enforcement; patrol functions; searches for lost individuals; and responding to emergencies and requests from other law enforcement agencies. As Deputies, Stuby and Berkey did not have supervisory authority over anyone, and did not have the power to hire, fire, or discipline anyone. As Deputies, Stuby and Berkey were not involved in policy making or administration.

In January 2008, Reichelderfer assumed office as Sheriff of Bedford County in January 2008. Reichelderfer had supervisory authority over every employee in the Sheriff's office, including Stuby and Berkey. As the Sheriff of Bedford County, Reichelderfer has the power to appoint a chief deputy, "whose appointment shall be revocable by the sheriff at pleasure." As Sheriff, Reichelderfer "may revoke the appointment of deputies in the same manner as his chief deputy." In other words, he may revoke the appointment "at pleasure." Although the Bedford County Sheriff's office uses a Standard Operating Procedure ("SOP") manual, the manual does not set forth the consequences of a deputy violating a section of the SOP. Rather, discipline is a

matter of Reichelderfer's discretion. In the event of a violation of the SOP, Reichelderfer could chose to discipline the deputy, fire him or her, or do nothing.

### III. The 2011 Campaign

In 2011, Sheriff Reichelderfer was up for reelection as Sheriff.  Reichelderfer ran in 2011 as the Republican candidate. Reichelderfer began campaigning for the 2011 election early in the year. In January 2011, Stuby decided to run as the Democratic candidate for Sheriff after being approached by the County Democratic chairman. In early 2011, Reichelderfer learned through reading the newspaper that Stuby would be running against him. According to Reichelderfer, Stuby should have resigned if he wanted to run for Sheriff, because the SOP prohibits "seeking publicity."  Reichelderfer believed running for office, in and of itself, violated the prohibition against seeking publicity. Although Reichelderfer believed Stuby should have resigned as a deputy if he wanted to run for Sheriff, he never told Stuby this. Reichelderfer claims he did not tell Stuby he should resign because he did not want any "extracurricular problems to show up during the election." Reichelderfer claims he did not fire Stuby even though he believed his campaign violated a personnel policy because he "didn't want a controversy to explode in the newspapers."

Stuby and Berkey identify themselves as Democrats, and Reichelderfer knew this.  No other deputies in the Sheriff's office identified themselves as Democrats.   The only other person in the office who, to Reichelderfer's knowledge, identified as a Democrat was a secretary, Cindy Emerick. In the beginning of 2011, Reichelderfer learned that Berkey was supporting Stuby's bid for Sheriff.   Reichelderfer also knew that Berkey had a sign in support of Stuby in his yard. Reichelderfer also knew Berkey's wife served as Stuby's campaign treasurer. Beginning in April 2011, Reichelderfer took notes regarding alleged policy infractions by Stuby and Berkey "to

keep track of what was going on." When Reichelderfer began taking notes about Stuby and Berkey, they had already been working for him for three years. Reichelderfer never took similar notes about Stuby and Berkey until after he learned Stuby was running against him. On Tuesday, November 8, 2011, Reichelderfer won reelection as the Sheriff.

## IV. Defendants' Discharge of Stuby and Berkey

The day after the election, November 9, 2011, Stuby and Berkey were scheduled off work. The following day, Thursday, November 10, 2011, Reichelderfer fired Stuby and Berkey. Reichelderfer fired Berkey first. Reichelderfer told Berkey he was a good deputy, was good at his job, and knew what he was doing, but getting involved with Stuby was insubordination. Reichelderfer told Berkey he did not want Berkey working in his department anymore, and to turn in his things. Approximately five minutes later, Reichelderfer fired Stuby. Reichelderfer did not tell Stuby, or attempt to tell Stuby, the reasons for firing him. Reichelderfer claimed he discussed firing Stuby and Berkey with his Chief Deputy, Troy Nelson. According to Reichelderfer, Nelson agreed with the decision to fire Stuby and Berkey. However, Nelson testified he had not heard about Reichelderfer's plans to fire Stuby and Berkey until a few minutes beforehand, and did not learn the reasons why Reichelderfer fired Stuby and Berkey until after the fact. Nelson did not tell Reichelderfer whether he agreed or disagreed with the decision to fire Stuby and Berkey.

## V. Defendants' Reasons for Discharging Berkey

### A.    Defendants' Initial Stated Reasons

When asked, under oath, in discovery for "each and every reason why Plaintiff Berkey was terminated," Defendant Bedford County responded: "See termination letter attached to Rule 26 Disclosure Letter." The "termination letter" referenced in Defendant's Rule 26 Disclosures is

a letter from Reichelderfer to the Bedford County commissioners dated November 10, 2011, with the subject "Termination of Deputy Luke Berkey." The letter states, "Deputy Luke Berkey has been terminated for insubordination," and identified 3 sections of the SOP that Berkey allegedly violated.   According to Reichelderfer, "these actions came in support of Deputy Stuby's election bid for Sheriff which by Deputy Berkey's subversive actions undermined the day to day operations of the sheriff's office."

        **1.**      **"Unbecoming Conduct"**

According to Reichelderfer's termination memo, Berkey violated Section 1.02 of the SOP. Section 1.02 of the SOP, entitled "Unbecoming Conduct," provides:

> A member shall not conduct himself/herself in a manner unbecoming to a Deputy Sheriff. Unbecoming conduct is that type of conduct, which could reasonably be construed as destroying public respect for and/or confidence in the Bedford County Sheriff's Office.

According to Reicheldfer, Berkey violated this section as follows:

> Deputy Berkey's unbecoming conduct in assisting Deputy Stuby's SOP violations, in running for the position of Sheriff, of the Standard Operating Procedures could reasonably be construed as destroying public respect for the Sheriff."

        **2.**      **"Loyalty to Office"**

According to Reichelderfer's termination memo, Berkey violated Section 1.04 of the SOP. Section 1.04 of the SOP, entitled "Loyalty to Office" provides:

> A member shall not publicly criticize the Sheriff's office, its policies, or other members or employees by talking, writing, or other expression that is defamatory, obscene, or unlawful, or when the member knows that such criticism is false.

According to Reichelderfer, Berkey violated this section as follows:

> Deputy Berkey failed to display loyalty to office by assisting Deputy Charles Stuby's violations of the SOP in Deputy Stuby's running for the office of Sheriff. Deputy Stuby at a meet the candidate nite [sic] on November 3, 2011, named Luke   Berkey as his new Chief Deputy upon winning said office.

When asked in what way Berkey criticized the sheriff's office, its members, or its employees, Reichelderfer responded: "I don't have an answer right now." When asked if there was something Reichelderfer could refer to answer the question, Reichelderfer responded: "I'm going blank with this one."   When asked what Berkey did wrong when Stuby named him the future chief deputy, Reichelderfer responded: "there was already a plan in place to be chief deputy and obviously there were other underlying factors that I wasn't aware of that ... Mr. Berkey ... had been more involved in the election process than I first realized."   Reichelderfer further testified that Berkey's involvement in the election process was insubordinate.

### 3.      "Seeking Publicity"

According to Reichelderfer's termination memo, Berkey violated Section 1.06 of the SOP. Section 1.06 of the SOP, entitled "Seeking Publicity" provides:

> A member shall not directly or indirectly seek publicity for himself/herself through the press, radio, television, or other news media; nor shall he/she furnish information to the same for the purpose of gaining personal recognition as a deputy sheriff.

According to Reichelderfer, Berkey violated this section as follows:

> Deputy Berkey assisted in taking a cell phone photo and forward the same to the BEDFORD GAZETTE for the purpose of initiating a PR news release for the purpose of a campaign picture of Deputy Stuby who was running for Sheriff election, rescuing a dog in floodwaters.   The picture was published by the Bedford Gazette.

During the weekend of September 10-11, 2011, the Bedford Gazette published an article about a flood, during which the Fishland Boat Commission called 911 when he saw dogs stranded in the water. Reichelderfer was interviewed for that article, and stated: "Really it's not our place to be doing this, but I had the people free so I thought we'd step up to the plate." Stuby and Berkey were two of the people Reichelderfer sent to "step up to the plate."   When Stuby

and Berkey responded to the call, Stuby rescued a dog in the flood.  Reichelderfer admitted Stuby did nothing wrong in rescuing the dog.  Berkey took a photograph on his cell phone of Stuby rescuing the dog. According to Reichelderfer, Berkey's sending of the photograph "was basically a photo op for Mr. Stuby for the Fall election." The article that published the photograph did not mention Stuby's campaign for office in any way. Reichelderfer has no knowledge of Berkey telling the Bedford Gazette to print the photograph because Stuby was running for office. Reichelderfer did not mention the photograph when he fired Berkey.

### B.    Additional Reasons

During Reichelderfer's deposition, he identified additional reasons for firing Berkey that did not appear in the termination memorandum, which was incorporated as "each and every" reason Defendant fired Berkey.   Reichelderfer did not tell Chief Deputy Nelson he fired Stuby and Berkey for any reason other than what was listed on the letters to the Commissioners.

### 1.    Cynthia Fouts Incident

According to Reichelderfer, a resident named Cynthia Fouts told him Stuby and Berkey arrived at her house in uniform, in a marked car, and that there were Stuby campaign signs in the trunk of the car. Fouts called Reichelderfer and reported this on September 20, 2011, approximately a month and a half before Stuby and Berkey were fired. Reichelderfer never told Stuby and Berkey what Fouts told him. Had Reichelderfer talked to Berkey, he would have learned  trunk lid was not open while Stuby and Berkey were at Fouts' house, and that he never saw any Stuby election signs in a county vehicle. Reichelderfer also would have learned that Berkey did not talk to Fouts on the day in question, other than possibly saying "hi." Fouts admitted that Berkey did not do anything she perceived to be campaigning for Stuby, except that Stuby introduced Berkey as his new second in command. Fouts did not tell Reichelderfer

anything Berkey said or did.  Fouts  supported  Reichelderfer  during  the  election,  and  donated money to his campaign.   Reichelderfer claimed he did not discuss Fouts' report with Stuby and Berkey because he did not want to see a controversy in the newspaper.

### 2.    Thomas Chevrolet Incident

According to Reichelderfer, his administrative assistant, Ashley Faupel, told him her father, Mark Zimmerman, worked at Thomas Chevrolet and saw Stuby and Berkey there in uniform and in a marked car. Reichelderfer learned this information from Faupel on July 5, 2011–approximately four months before firing Stuby and Berkey.  Reichelderfer never talked to Stuby, Berkey, Zimmerman, or the salesman, Casey Shoemaker, about Stuby and Berkey's alleged visit to Thomas Chevrolet. Had Reichelderfer talked to Berkey about this incident, he would have learned that Berkey went to Thomas Chevrolet on his lunch break, asked about the terms of a vehicle he was interested in, and went back to work.   He did not test drive a vehicle that day, and was there for less than 5 minutes. Reichelderfer claims he did not mention the Thomas Chevrolet incident in the termination memo because he thought he had already written enough.

### 3.    Soliciting Votes from Prisoners

According to Reichelderfer, Stuby and Berkey allegedly solicited votes for Stuby from prisoners during transports.  Reichelderfer claimed that Deputies Robert Fleetwood, Matthew Diehl, and Ed Ibarra told him Stuby and Berkey solicited votes from prisoners.   Reichelderfer did not discuss Stuby and Berkey's alleged solicitation of prisoners with Stuby and Berkey at any time.   When asked why the solicitation of votes from prisoners did not appear in the termination memos, Reichelderfer responded: "Basically I forgot."   Berkey never solicited votes from any prisoners.

## VI. Defendants' Reasons for Discharging Stuby

### A.   Defendants' Initial Stated Reasons

When asked, under oath, in discovery for "each and every reason why Plaintiff Stuby was terminated," Defendant Bedford County responded: "See termination letter attached to Rule 26 Disclosure Letter."   The "termination letter" referenced in Defendant's Rule 26 Disclosures is a letter from Reichelderfer to the Bedford County commissioners dated November 10, 2011, with the subject "Termination of Deputy Charles Stuby."   The letter states, "Deputy Charles Stuby has been terminated for insubordination," and identified 6 sections of the SOP that Stuby allegedly violated.

### 1.   "Unbecoming Conduct"

According to Reichelderfer's termination memo, Stuby violated Section 1.02 of the SOP. As set forth above, Section 1.02 of the SOP, entitled "Unbecoming Conduct," provides:

> A member shall not conduct himself/herself in a manner unbecoming to a Deputy Sheriff. Unbecoming conduct is that type of conduct, which could reasonably be construed as destroying public respect for and/or confidence in the Bedford County Sheriff's Office.

According to Reichelderfer, Stuby violated Section 1.02 as follows:

> Deputy Stuby conducted himself in a manner unbecoming of a deputy sheriff in [sic] which could reasonably be expected to destroy public respect for the Sheriff in the November 5 weekend BEDFORD GAZETTE and also November 2 issue of the same newspaper by misconstruing Budget information and DARE/retirement information.

On November 5, 2011, both Stuby and Reichelderfer interviewed with the Bedford Gazette regarding the DARE program. In the article, Reichelderfer claimed Stuby "threw the [DARE] program into jeopardy" in 2008, when approximately one hour after Reichelderfer took office, Stuby allegedly said he wanted to resign from leading DARE.   In the article, Stuby

disagreed with Reichelderfer's characterization, and stated "It doesn't matter who said what (and) when. I never told him I would quit. I wasn't walking away." Reichelderfer claimed Stuby's disagreement regarding whether he said he would resign from DARE was "unbecoming."

In the November 2, 2011 Bedford Gazette, both Stuby and Reichelderfer responded to written questions regarding their campaigns. In that article, Stuby stated the highest budget under Reichelderfer's predecessor, Gordon Diehl, was $525,000. According to Reichelderfer, the highest budget under Diehl was in the bracket of $600,000; approximately $609,000. Stuby had received the figure of $525,000 from Gordon Diehl himself.

### 2. "Loyalty to Office"

According to Reichelderfer's termination memo, Stuby violated Section 1.04 of the SOP. As set forth above, Section 1.04 of the SOP, entitled "Loyalty to Office," provides:

> A member shall not publicly criticize the Sheriff's office, its policies, or other members or employees by talking, writing, or other expression that is defamatory, obscene, or unlawful, or when the member knows that such criticism is false.

Reichelderfer claimed Stuby violated Section 1.04 as follows:

> Deputy Stuby publicly criticized the Sheriff during Deputy Stuby's run in opposition to the Sheriff in a county election campaign in violation of this section prohibiting same.

Reichelderfer claimed Stuby publicly criticized him by disagreeing that he said he would resign from the DARE program, and by stating an incorrect budget figure for prior Sheriff Gordon Diehl, as set forth above.

### 3. "Seeking Publicity"

According to Reichelderfer's termination memo, Stuby violated Section 1.06 of the SOP. As set forth above, Section 1.04 of the SOP, entitled "Seeking Publicity" provides:

A member shall not directly or indirectly seek publicity for himself/herself through the press, radio, television, or other news media; nor shall he/she furnish information to the same for the purpose of gaining personal recognition as a deputy sheriff.

According to Reichelderfer, Stuby violated Section 1.06 as follows:

Deputy Stuby by his actions as running for the office of Sheriff without resigning his position as Deputy Sheriff, did directly and indirectly seek publicity for himself in violation of specifics of this section.

Reichelderfer claimed that by virtue of running for office, Stuby sought publicity for himself.

### 4.     "Badge of Office"/ "Solicitation"

According to Reichelderfer's termination memo, Stuby violated Section 1.07, Subsection A of the SOP.   Section 1.07 defines "badge of office" as follows:

the identification card, badge, official position, title, uniform, or any other tangible or intangible thing by which it could be construed that the concept of "Sheriff's Office" is being interjected.

The end of the "Badge of Office" section provides:

It is the specific intent of this section to limit the use of the member's badge of office to matters within the scope of his/her employment. This section shall not be construed to restrict any member in the free exercise of constitutionally protected freedoms that are not necessarily limited by the conditions of his/her employment.

Section 1.07, Subsection A provides:

A member shall not participate in any form of solicitation where use is made of his/her badge of office, without the written approval of the Sheriff. 'Participate' as used in this subsection is not limited in its definition to active conduct of the member, but rather extends to tacit approval of the member's badge of office by any other party.

According to Reichelderfer, Stuby violated Section 1.07, Subsection A as follows:

Deputy Stuby on several occasions used a black t shirt [b]earing the words 'SHERIFF' normally used for Sheriff's office operations and also a cap bearing the same words during publicity seeking events such as the Southern cove turkey

dinner and also Fall Foliage Festival union fundraiser without written approval of the Sheriff.

Reichelderfer admitted the hat that Stuby wore was not issued by the Sheriff's department.   Stuby wore the hat to a Sheriff Deputy's union barbeque at the Bedford County Fall Foliage festival.   Stuby did not campaign during the Fall Foliage festival.      Reichelderfer never saw Stuby wear the t-shirt in person, but rather saw a picture of him wearing it at a fundraiser for the Southern Cove Fire Company.   Reichelderfer did not know whether the shirt Stuby wore was department-issued.   The t-shirt was not department-issued.   Rather, Stuby purchased it with his own money. Reichelderfer claims he did not say anything to Stuby about the shirt or the hat because they were in the middle of an election and he did not want to cause a controversy.

### 5.   "Badge of Office"/Personal Gain

According to Reichelderfer's termination memo, Stuby violated Section 1.07, Subsection B of the SOP.   This section provides:

> A member shall not use or permit the use of his/her badge of office for personal or financial gain.

According to Reichelderfer, Stuby violated Section 1.07, Subsection B as follows:

> Deputy Stuby used his badge of office as previously stated for personal and financial gain in trying to be elected for the office of Sheriff campaign in which Deputy Stuby was in violation.

According to Reichelderfer, the wearing of the "Sheriff" t-shirt, in and of itself, meant Stuby was interjecting the office of Sheriff for personal gain.

### 6.   "Badge of Office"/Written Permission

According to Reichelderfer's termination memo, Stuby violated Section 1.07, Subsection C of the SOP.   This section provides:

A member shall not permit the use of his/her badge of office for the benefit of any individual or group of individuals, except with the written consent of the Sheriff.

According to Reichelderfer, Stuby violated Section 1.07, Subsection C as follows:

Deputy Stuby failed to have written permission for this section which was to benefit himself in the election.

**B.     Additional Reasons**

During Reichelderfer's deposition, he identified additional reasons for firing Stuby that did not appear in the termination memorandum, which was incorporated as "each and every" reason Defendant fired Stuby.

### 1.     Cynthia Fouts Incident

As explained above, a resident named Cynthia Fouts told Reichelderfer on September 20, 2011 that Stuby and Berkey arrived at her house in uniform, in a marked car, and that there were Stuby campaign signs in the trunk of the car.   Reichelderfer never told Stuby and Berkey what Fouts told him.   Had Reichelderfer talked to Stuby about Fouts, he would have learned that he stopped at Fouts' house because he received a memorandum that deputies are supposed to stop and talk to people in the community.   Stuby did not have election signs with him at the time.

### 2.     Thomas Chevrolet Incident

As explained above, on July 5, 2011, Reichelderfer's administrative assistant, Ashley Faupel, told him her father, Mark Zimmerman, worked at Thomas Chevrolet and saw Stuby and Berkey there in uniform and in a marked car. Reichelderfer never talked to Stuby, Berkey, Zimmerman, or the salesman, Casey Shoemaker, about Stuby and Berkey's alleged visit to Thomas Chevrolet. Had Reichelderfer talked to Stuby, he would have learned that he was never at Thomas Chevrolet when anyone from the Sheriff's office performed a test drive or looked at a vehicle. Stuby had gone to Thomas Chevrolet in the past for oil changes and car washes.

### 3.      Soliciting Votes from Prisoners

As explained above, Reichelderfer claimed he heard from other deputies that Stuby and Berkey solicited votes from prisoners.   He did not ask Stuby or Berkey if this was true. Stuby never solicited votes from any prisoners.

### 4.      Kroll Incident

According to Reichelderfer, then-Assistant Public Defender Lesley Childers-Potts District Attorney Higgins, and public defender secretary Kendra LaSalle told him that Stuby gave legal advice to a prisoner named John Kroll. Reichelderfer learned this information on October 20, 2011.   Stuby testified that after a transport, Kroll asked Stuby if he was familiar with a place called Lake Gordon, and whether it was in Pennsylvania or Maryland. He continued that he was charged in Maryland for the same thing he was being charged with in Pennsylvania. Stuby said he thought Kroll needed to talk to his attorney if that was the case. Childers-Potts heard from two deputies, Fleetwood and Ibarra, that Stuby allegedly attempted to give legal advice to Kroll by telling him he should not have been charged with crimes in both Pennsylvania and Maryland, and that it was double jeopardy.

Despite whatever Stuby told him, Kroll was able to understand his rights, and entered a guilty plea approximately 3 hours after he talked to Stuby.   Reichelderfer told Childers-Potts he would tell Stuby it was inappropriate to give legal advice to criminal defendants. However, Reichelderfer did not mention the Kroll issue to Stuby, allegedly because they were in the middle of a campaign.   Reichelderfer claimed he did not mention the Kroll issue in the termination memo because it slipped his mind.

## V. EXPERT REPORTS

None.

## VI. SPECIAL DAMAGES

Plaintiff Stuby's salary for 2011 was $28,167.12 or $541.67 weekly. He also received yearly benefits in the amount of $5,995.79 or $115.30 weekly. See documentation attached hereto as Exhibit "A". Plaintiff Stuby was terminated on November 10, 2011. Therefore, he sustained a wage loss of $3,791.69 and a benefit loss of $807.10 for 2011. Plaintiff's earnings for 2011 are attached hereto as Exhibit "B". During 2012, Plaintiff Stuby's earnings were $1,894. See documentation attached hereto as Exhibit "D". Therefore, he sustained a wage loss of $26,273.12 and a benefit loss of $5,995.79. His earnings for 2013 were $284.50. See documentation attached hereto as Exhibit "F". Losses for 2013 were $27,882.62 for wages and $5,995.79 for benefits.

2011 - $ 4,598.79
2012 - $32,268.91
2013 - $33,878.41

Total Wage and Benefit Loss: $70,746.11

Plaintiff Berkey's salary for 2011 was $27,352.80 or $526.01 weekly. He also received yearly benefits in the amount of $5,854.62 or $112.58 weekly. See documentation attached hereto as Exhibit "A". Plaintiff Berkey was terminated on November 10, 2011. Therefore, he sustained a wage loss of $ 3,682.07 and a benefit loss of $788.06 for 2011. Plaintiff's earnings for 2011 are attached hereto as Exhibit "C". Plaintiff Berkey's found subsequent employment in March, 2012 and his earnings were $19,568.00. See documentation attached hereto as Exhibit "E". Therefore, he sustained a wage loss of $7,784.80 and a benefit loss of $450.32. His earnings for 2013 were $30,133. See documentation attached hereto as Exhibit "F".

2011 - $ 4,470.13
2012 - $ 8,235.12

Total Wage and Benefit Loss: $12,705.25

Plaintiff reserves the right to supplement as these damages are ongoing.

## VII. UNUSUAL LEGAL ISSUES

None.

## VIII. TRIAL

Trial by jury, lasting approximately 2 days for the Plaintiff's case in chief.

## IX. PLAINTIFF'S EXHIBITS

Plaintiff hereby grants permission to counsel for Defendant to examine Plaintiff's trial exhibits at the offices of Samuel J. Cordes & Associates.

## X. OPPOSING PARTY'S EXHIBITS

Plaintiff's counsel will indicate agreement or disagreement with the authenticity and admissibility of Defendant's exhibits once they are identified and Plaintiff's counsel has had an opportunity to examine them.

Respectfully submitted,

**SAMUEL J. CORDES & ASSOCIATES**


/S/Christine T. Elzer
Samuel J. Cordes
Christine T. Elzer

Pa.I.D. #54874 (Cordes)
Pa. I.D.#208157 (Elzer)

245 Fort Pitt Boulevard, 2nd Floor
Pittsburgh, PA 15222
(412) 281-7991

Attorneys for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I   hereby certify that on January 16, 2014, a copy of the foregoing *Plaintiffs' Pretrial Statement* was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

<u>/s/ Christine T. Elzer</u>
Christine T. Elzer